IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| YVETTE NORMAN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 7:22cv00096 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| LEONARD'S EXPRESS, INC., | ) | By:  Hon. Thomas T. Cullen |
| | ) |      United States District Judge |
| Defendant. | ) | |

This case arises from a serious motor vehicle accident between Plaintiff Yvette Norman ("Norman") and Julian J. Kaczor, who was operating a semitruck owned by Defendant Leonard's Express, Inc. (Am. Compl. ¶ 2 [ECF No. 37].) Presently before the court is Norman's motion *in limine* to: (1) exclude the report and testimony of the defendant's life-care planner Shelby Dubato ("Dubato") or, in the alternative, limit her testimony if she is permitted to testify; (2) preclude defense experts from offering undisclosed opinions relating to Norman's future care needs; and (3) compel production of Dubato's statement of compensation. (ECF No. 42.) For the reasons explained below, the court will exclude Dubato's report and testimony—mooting those portions of Norman's motion that relate to the scope of her testimony and statement of compensation—and deny without prejudice as unripe Norman's motion to preclude testimony from other unspecified experts who are not the subject of this motion.

### I.   NORMAN'S MOTION TO EXCLUDE DUBATO'S REPORT AND TESTIMONY

### A.  The Parties' Contentions

Norman and Leonard's Express each intend to offer an expert to present a life-care plan forecasting the cost of Norman's future care needs stemming from the motor vehicle accident that gave rise to this lawsuit. Norman's proposed expert is Elizabeth Zaras ("Zaras"), and Leonard's Express has retained Dubato. In her report and later-filed supplement,[1] Dubato rebuts and challenges Zaras's calculation of Norman's future care needs—both as to what those needs will be and their respective costs.[2] Because Dubato is not a licensed medical doctor, Norman contends that she is not qualified to render an expert opinion about the future necessity or non-necessity of medical and surgical treatment, therapeutic treatment, and prescription medication.[3] Norman further argues that Dubato's report was expressly conditioned on endorsement by a qualified medical expert and that, since that requested

---

[1] Norman claims that Leonard's Express submitted two Dubato-authored reports: (1) Dubato's *Preliminary Life Care Plan Analysis for Yvette Norman* (dated Mar. 3, 2023) (ECF No. 48-1) (the "Life Care Plan") was disclosed on March 7, 2023 (the day of Leonard's Express's expert disclosure deadline, *see* Mot. for Ext. of Time, Dec. 20, 2022 [ECF No. 11]; Order, Dec. 21, 2022 [ECF No. 12]); and (2) Dubato's *Addendum to 3-3-23 Preliminary Life Care Plan Analysis* (ECF No. 48-2) (the "Addendum") was disclosed on March 20, 2023 (nearly two weeks after Leonard's Express's expert disclosure deadline).

[2] From the parties' filings, it appears that the gulf between the proposed experts' opinions regarding future medical-care needs is substantial—in the vicinity of $1,000,000. Dubato reports that Norman's future needs are somewhere between $200,000–$400,000, and Zaras reports that they are somewhere around $1,300,000. (*See* Life Care Plan at 35.)

[3] Dubato's report indicates that she holds a Master of Social Work degree and is licensed or certified as a clinical social worker, disability management specialist, case manager, and life-care planner. (Life Care Plan at 3.)

endorsement was never obtained[4] and Leonard's Express's expert disclosure deadline has passed, Dubato's report and testimony should be excluded at trial.[5]

Norman correctly cites case law from various districts for the proposition that life-care planners are not qualified to render expert medical opinions about future medical needs but, instead, are qualified only to take valid expert medical opinions and "assimilate that information into a summary of future medical and rehabilitation care and its related expenses for the jury . . . [because] the life care plan is only as valid as the medical opinions on which it is based." *Feliciano v. Cate St. Capital, Inc.*, No. 2:13-cv-00162, 2014 WL 7642091, at *2 (D. Wyo., Sept. 16, 2014). Life care planners, in other words, flesh out the details and attendant costs of future medical needs based on the medical diagnosis and opinions of physicians and other qualified health-care providers. But Norman complains that rendering medical opinions is precisely what Dubato does in her report, pointing to her determinations that various medical opinions endorsed by Norman's medical expert, Dr. O'Shanick, are either "indicated" or "not indicated." At bottom, Norman argues that Dubato's threshold *indicated-or-not-indicated* determinations are the province of a medical expert—not a life-care planner—and that, because they form the basis for Dubato's calculations of Norman's future medical care needs and expenses, her opinion should be excluded.

Leonard's Express counters that Dubato's report need not, as a matter of law, be endorsed by a physician to be admissible, citing *Boden v. United States*, No. 7:18CV00256, 2019

---

[4] Leonard's Express has disclosed two medical experts—Isabelle Richmond, M.D., a neurosurgeon, and Jonathan DeRight, Ph.D., a neuropsychologist—but neither has endorsed the Life Care Plan.

[5] Norman's life-care plan report, prepared by non-physician Zaras, MSN, RN, FNP-C, CLCP (ECF No. 43-1), was reviewed, approved, and endorsed by her medical expert, Gregory O'Shanick, M.D. (*See* ECF No. 43-2 ¶ 36).

WL 6883813, at *5 (W.D. Va. Dec. 17, 2019). It further argues that Dubato's background, training, and experience, as well as the reliable methods she employed (including reviewing medical records, discovery materials, and medical expert reports), make the Life Care Plan admissible.

In reply, Norman argues that *Boden* is distinguished because the life-care planner's recommendations in that case involved "support care" like scooters, shower rails, and in-home care attendants, whereas Dubato's report consists entirely of her determinations as to whether Dr. O'Shanick's recommendations for specific medications and services are "indicated" or "not indicated." Norman highlights *In re Ethicon, Inc.*, No. 12-cv-4301, 2014 WL 186872, *11–12 (S.D. W. Va. Jan. 15, 2014), where the Southern District of West Virginia excluded portions of a life-care plan where a physician had not reviewed the plan. This case involves the converse factual scenario—i.e., a life-care planner seeking to exclude numerous items from, rather than adding items to, the report—but the same flawed methodology—i.e., insufficient medical support.

**B. Law**

Federal Rule of Evidence 702 governs the admissibility of expert witnesses, along with the Supreme Court's decisions in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and *Khumo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). Collectively, these require the trial court to ensure that the proffered expert testimony is both relevant and reliable. *Daubert*, 509 U.S. at 589. "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence

or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. "The question of whether a witness is qualified to testify is context-driven and can only be determined by the nature of the opinion he offers." *RG Steel Sparrows Point, LLC v. Kinder Morgan Bulk Terminals, Inc.*, 609 F. App'x 731, 738 (4th Cir. 2015) (cleaned up) (unpublished). Ultimately, the court's objective should be to ensure "that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152. Although the court must act as the gatekeeper for expert opinions, it must be mindful "that the traditional and appropriate means of challenging expert testimony are vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Kovari v. Brevard Extraditions*, LLC, 461 F. Supp. 3d 353, 369 (W.D. Va. 2020) (internal quotation marks and citations omitted). Nevertheless, reliability and relevancy are preconditions to the admissibility of expert testimony. *See Sardis v. Overhead Door Corp.*, 10 F.4th 268, 282 (4th Cir. 2021) (citing *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017)). And courts may not "abandon the gatekeeping function." *Nease*, 848 F.3d at 230 (quoting *Kumho Tire Co.*, 526 U.S. at 158–59 (Scalia, J., concurring)).

"The proponent of expert testimony has the burden of establishing its admissibility by a preponderance of proof." *Smith v. Wyeth-Ayerst Lab'ys Co.*, 278 F. Supp. 2d 684, 691 (W.D.N.C. 2003) (citing *Daubert*, 509 U.S. at 592 n.10). "[A]ny expert . . . must have the specialized knowledge or skill in the specific area in which the testimony is proffered." *Id.* at

698. If an expert is not qualified in the first place, the court's gatekeeper function under Rule 702 mandates exclusion of his/her testimony in that area of non-expertise. *See Daubert*, 509 U.S. at 589, 597; *Kumho Tire Co.*, 526 U.S. at 147 (holding that *Daubert's* "gatekeeping obligation" applies to all expert testimony).

"[D]ue to the difficulty of evaluating their testimony, expert witnesses have the potential to be both powerful and quite misleading." *Cooper*, 259 F.3d at 199 (citations omitted). "[G]iven the potential persuasiveness of expert testimony, proffered evidence that has a greater potential to mislead than to enlighten should be excluded." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). Assuming that the evidence is reliable, the court must ask whether it will "assist the trier of fact to understand or determine a fact in issue." *Md. Cas. Co.*, 137 F.3d at 783 (quoting *Daubert*, 509 U.S. at 592). "Trial judges have 'considerable leeway' in excluding evidence, and are required to ensure that 'expert testimony must be based on sufficient facts or data, and the expert must arrive at his opinions by properly applying reliable principles and methods to the facts.'" *McCulloch v. Tahsin Indus. Corp., USA*, No. 6:20-CV-00035, 2022 WL 4484214, at *12 (W.D. Va. Sept. 27, 2022) (quoting *Hickerson v. Yamaha Motor Corp.*, 882 F.3d 476, 480 (4th Cir. 2018)).

**C. Analysis**

As an initial matter, physician endorsement is not necessarily required for admission of a life care plan. "[C]ourts in this circuit have found that life-care plans can be admissible without a physician review, so long as they are reliable." *Boden*, 2019 WL 6883813, at *4. In *Boden*, the plaintiff sought to exclude the defendant's expert's testimony critiquing the plaintiff's expert "because he argue[d], as a registered nurse, she cannot opine on

the medical necessity of his *support care* without the review of a physician." 2019 WL 6883813, at *3 (emphasis added). The court disagreed, finding that the testimony was reliable and did not require a physician's review to be admissible, and that any questions as to the weight of the expert's life-care plan critique were properly reserved for cross-examination. *Id.*

Although a life-care plan need not be approved by a physician, the medical treatments and therapies outlined therein must be predicated on expert medical opinion. In *In re Ethicon, Inc.*, the Southern District of West Virginia excluded those portions of a life-care plan that were not specifically grounded in a medical expert's opinions "[b]ecause much of [the] life care plan describes particular medical procedures and services, [and] there must be a medical foundation for her recommendation. In other words, a doctor or medical expert must opine to a reasonable degree of medical certainty that the items listed in the life care plan are necessary." 2014 WL 186872, at *12. Ultimately, the court held that only the life-care planner's "recommendations that are very specifically grounded in [the medical expert's] medical opinions [we]re not excluded, and that the residue of her opinions" were excluded. *Id.* at *13 (cleaned up). The legal principle elucidated in *In re Ethicon* is equally applicable here: a non-physician life-care planner may not opine independently about the necessity of specific medical treatments and procedures because they are outside the scope of his area of expertise; instead, a life-care planner rendering such determinations must hitch them to a medical expert's or treating physician's opinion.[6]

---

[6] Of course, if a non-physician life-care planner persuades a court that he or she has the requisite knowledge, skill, experience, training, or education to render such an opinion, the opinion may be admissible. Such is not the case here, though.

The court agrees with the plaintiff that this case is more like *In re Ethicon*, than *Boden*. Despite Dubato expressly listing the extensive documents, medical records, and medical expert reports on which she relied (Life Care Plan at 9; Addendum at 5), fairly thoroughly reviewing them (Life Care Plan at 10–17, 21–22, 24; Addendum at 6–8), drawing on her education, training, and experience (Dubato CV [ECF No. 48-1 at 11–13]), and her repeatedly expressing that she relied on medical records (Life Care Plan, *passim*), Dubato's opinions exceed the scope of her expertise. And by selecting *which* medications, treatments, therapies, or modalities *she* believed Norman would require in the future, she rendered medical opinions without sufficient medical grounding or expert support.

For example, in her report under the "Medications" category of future medical needs that the plaintiff's expert Dr. O'Shanick says are necessary, Dubato counters that Nurtec, Prazosin, and Voltaren gel are "not indicated," while conceding that Ajovy (a different headache drug) is necessary. She purports to support this medical opinion by noting that Dr. Nagaraja (a treating physician) opined that it would likely be needed lifelong for headaches, Norman's reporting that it has benefited her, and the absence of any medical opinion to the contrary. (Life Care Plan at 30, 37.) But neither Dr. Richmond nor Dr. DeRight opined that Norman would not need Nurtec, Prazosin, or Voltaren to treat her headaches in the future, as Dr. O'Shanick implicitly recognized. As to Nurtec, Dubato opines that it is unnecessary but expresses that she "would defer to the defense medical expert regarding whether this medication is, more likely than not, required for Ms. Norman's life expectancy." (Life Care Plan at 30.) No defense medical expert (or any treating physician that the court is aware of) opined that Nurtec was not medically necessary. As to Voltaren gel, Dubato opines that it is

unnecessary because "throughout the medical treatment records provided for our review, there were no TMJ-related[7] complaints or symptoms." (Life Care Plan at 31.) But Dr. O'Shanick says Voltaren gel is necessary, and Dubato is not qualified to counter that medical opinion.

Under the "Projected Evaluations" category, Dubato opines that physical therapy, occupational therapy, and speech therapy evaluations are "not indicated," concomitantly assigning them (and all "not indicated" items) a $0 lifetime value. (*Id.* at 35.) For "Projected Therapeutic Modalities," Dubato opines that physical therapy, occupational therapy, speech therapy, vision therapy, TMJ therapy, a custom-fit night guard, counseling with EMDR therapy, psychotherapy, and acupuncture are all "not indicated." (*Id.* at 36.) For "Future Medical Care – Routine," Dubato opines that an audiology evaluation and two different panels of labs are "not indicated," while conceding that Botox injections, neurology follow-up, and brain MRI are all indicated at the frequency Zaras says, although she assigns them a different cost.[8] Defendant's problem is that, by endorsing Zaras's entire report, Dr. O'Shanick specifically endorsed each of these purportedly "not indicated" medical therapies, medications, and the like. (*See* Dr. O'Shanick Report at 22–23.) And Dubato is not a medical expert, so only those of her opinions "very specifically" grounded in a medical expert's opinion passes muster. *In re Ethicon*, 2014 WL 186872, at * 13. In other words, Dubato does not—and on the record

---

[7] "TMJ" refers to the temporomandibular joint, the joint that connects the jawbone to the skull.

[8] For "Future Medical Care Surgical/Aggressive," Dubato agrees with the items in Zaras's report but presents a different cost for them.

before the court, cannot—point to a medical expert or treating physician who opines that Norman will need what Dubato says is "indicated," *and nothing more.*

After closely reviewing the defense medical expert's reports, the court finds that only some of Dubato's opinions can be supported by reference to a proper medical opinion. Dubato's opinions that occupation therapy, speech therapy, psychotherapy, the medication Prazosin (*see* Dr. O'Shanick report at 22 ("to reduce autonomic arousal and improve sleep due to PTSD")), counseling with EMDR therapy (used in PTSD treatment[9]), and acupuncture (*id.* at 23 ("Acupuncture to reduce autonomic hyperarousal due to PTSD")) are "not indicated" are adequately grounded in the medical expert reports. Dr. Richmond opined that Norman suffered no traumatic brain injury (Richmond report at 4), and Dr. DeRight opined that Norman suffered no accident-related post-traumatic stress disorder (DeRight report at 13) and that there is "no basis for further treatment or need for recovery *from cognitive and psychiatric perspectives.*" (Dr. DeRight report at 15 (emphasis added).) But the court finds that Defendant has not met its burden of showing that the remainder of the "non-indicated" medical items in Dubato's report are adequately grounded in the medical expert reports: physical therapy evaluation, vision therapy evaluation, audiology evaluation, TMJ therapy, custom-fit night guard, Nurtec,[10] Voltaren gel, and two different panels of bloodwork labs. These not-adequately-grounded items comprise over half of the "not indicated" items in Dubato's report.

---

[9] *See* Mayo Clinic, *Post-traumatic stress disorder (PTSD)*, available at www.mayoclinic.org/diseases-conditions/post-traumatic-stress-disorder/diagnostic-treatment/drc-20355973, last accessed April 14, 2023.

[10] Nurtec is the largest value item in Zaras's report, accounting for a lifetime cost of $513,886.80. Dubato's review of the medical records indicates that Norman is currently taking Nurtec, "about 8 pills every 2 weeks." (Life Care Plan at 18.) Despite this, no defense expert opines that Nurtec is not needed to treat Norman's headaches. The closest they get is Dr. Richmond's opinion that it is impossible to tell whether the left-sided headaches pre-existed the motor vehicle accident because she was not provided with Norman's pre-accident

To be sure, Dr. Richmond indicated that, without pre-accident medical records, it is "impossible to determine" whether Norman's headache complaints are an exacerbation of a pre-existing condition. (Dr. Richmond report at 4.) But her report is silent regarding the headache medications and other treatments and consultations that Dr. O'Shanick opined were necessary. Similarly, Dr. DeRight concludes that Norman's pain from her headaches "is controlled" (Dr. DeRight report at 15), but only after acknowledging that injectable medications improved her headaches (Dr. DeRight report at 4). Dr. DeRight also did not opine that, in his medical opinion, these headache medications and other treatments and consultations, endorsed by Dr. O'Shanick, were unnecessary. Instead, Leonard's Express left Dubato, without qualification, to refute this medical opinion.

Moreover, the preceding analysis only deals with the items that Dubato says are "not indicated." Dubato simultaneously concedes that items like Ajovy, Botox injections, an MRI, and neurological follow-ups *are* indicated. But if she grounded her opinions in Dr. DeRight's and Dr. Richmond's reports, she would, as a matter of logic and common sense, have concluded that *nothing* was "indicated." Dubato's report is even more unreliable because her pick-and-choose approach is incompatible with the defendant's own medical experts' opinions. As the plaintiff aptly put it, Leonard's Express cannot have its cake and eat it too.

Compounding the defendant's problem and underscoring the court's *In re Ethicon* concerns, Dubato expressly requested physician review of both the Life Care Plan and its Addendum: "With the issue of this report, we are requesting for defense attorney . . . to

---

medical records. This is a far cry from opining that Nurtec is not medically necessary. And if the medical experts do not offer that medical opinion, Dubato may not.

- 11 -

provide a copy of this Life Care Plan Analysis to Dr. DeRight for review and signature upon his agreement with the information herein." (Life Care Plan at 39; *see also* Addendum at 10.) Despite this, no defense medical expert endorsed the Life Care Plan or its Addendum. And Dubato expressly recognized in her Addendum that neither Dr. DeRight nor Dr. Richmond provided an opinion regarding Norman's future medical needs related to the December 2019 motor vehicle accident, and that she therefore did not alter any of her Life Care Plan opinions, while inviting supplemental reports from the defense medical experts:

> **Life Care Planning Conclusions**
>
> Within the content of Dr. Richmond's 3-23-23 Preliminary report, she did not provide an opinion regarding the causal relationship between Ms. Norman's headache condition and the 12-28-19 MVA, and did not opine with regard to Ms. Norman's future medical needs related to the 12-28-19 MVA. Therefore, the receipt of this report did not alter any of our opinions included within our 3-3-23 Preliminary Life Care Plan. **However, if Dr. Richmond receives additional information and prepares a non-preliminary report, we reserve the right to consider this supplemental information provided by Dr. Richmond and, if necessary, alter our opinions accordingly.**
>
> Within the content of Dr. DeRight's 3-5-23 Neuropsychological Evaluation Report, he did not provide an opinion with regard to Ms. Norman's future medical needs related to the 12-28-19 MVA, specifically related to her headache and/or vision conditions and required treatment. Therefore, the receipt of this report did not alter any of our opinions included within our 3-3-23 Preliminary Life Care Plan. **We reserve the right to consider any supplemental information provided by Dr. DeRight and, if necessary, alter our opinions accordingly.**

(Addendum at 9.)[11]

In sum, Dubato's pick-and-choose approach—opining that some Dr. O'Shanick-certified medications, treatments, and consultations are necessary, while opining that others

---

[11] Dr. DeRight never supplemented his March 5, 2023 report. Dr. Richmond, on the other hand, supplemented her March 3, 2023 report, submitting her untimely-by-at-least-two-days March 9, 2023 supplemental report. And in her March 9 supplement, Dr. Richmond opined that "Ms. Norman has reached maximum medical benefit and does not require additional diagnostic studies or treatment." (*Id.* at 2.) But Dubato cannot justify her "indicated" or "not indicated" findings for particular medical treatments, consultations, or procedures (that Dr. O'Shanick opined are necessary) using Dr. Richmond's supplemental report's last-sentence catch-all statement that no future studies or treatment are needed. Dubato's Life Care Plan was filed on March 3, 2023—before Dr. Richmond's supplemental report issued, so she could not have considered it then. And Dubato expressly indicated in her March 20 Addendum that the new records she reviewed were limited to Dr. Richmond's March 3 report and Dr. DeRight's March 5 report. (Addendum at 5.) Dubato never relied on Dr. Richmond's untimely supplement at all.

are not—is the province of a medical expert, not a life-care planner—particularly one with no medical training. There is simply no reliable basis for most of her "indicated" or "not indicated" determinations. Without medical expert endorsement, Dubato could have disputed the *cost* of the items in Zaras's report to mitigate those that she perceived as inflated. But instead, she rendered medical expert opinions about which specific medications and therapies are necessary and which are not—something that she is unqualified to do. *See* Fed. R. Evid. 702.

Reliability and relevancy are preconditions to the admissibility of expert testimony. *See Sardis v. Overhead Door Corp.*, 10 F.4th at 282. And because Dubato is unqualified to render medical opinions, the court's gatekeeping obligation requires it to exclude all portions of her report that constitute medical opinions without very specific foundation in a treating physician's or medical expert's opinion. *See Daubert*, 509 U.S. at 589, 597; *Kumho Tire Co.*, 526 U.S. at 147; *In re Ethicon*, 2014 WL 186872, at *13. After those excisions, the Life Care Plan is effectively gutted, and what remains—whether presented with line-by-line redactions or other impracticable method—would be incomplete, contradictory, and, at bottom, wholly unreliable. To prevent this unreliable testimony from misleading (or confusing) the jury, *see Sardis*, 10 F.4th at 275, Dubato's entire report must be excluded.[12]

## II. NORMAN'S MOTION TO PRECLUDE DEFENSE EXPERTS FROM OFFERING UNDISCLOSED OPINIONS RELATING TO NORMAN'S FUTURE CARE NEEDS

Norman argues that, setting Dubato's report aside, Leonard's Express should be precluded from using reports or testimony relating to Norman's future care needs or its cost

---

[12] Because Dubato will not be permitted to testify, the portions of Norman's motion to limit her testimony and to compel her statement of compensation are moot.

from any experts not disclosed by its March 7, 2023 expert discovery deadline. To the extent that this portion of Norman's motion is intended to cover Dubato's Addendum, it will be denied as moot because Dubato's Addendum will be excluded on Rule 702 grounds. Because Norman has not moved to exclude any particular other such report or testimony, the court will not render a speculative or advisory opinion on this issue beyond Dubato's Addendum. This portion of Norman's motion will therefore be denied without prejudice as unripe as it relates to any proposed expert other than Dubato.

### III.   CONCLUSION

For the reasons stated above, the court will exclude Dubato's life-care plan and proposed expert testimony—mooting those portions of Norman's motion that relate to the scope of her testimony and statement of compensation—and deny without prejudice as unripe Norman's motion to preclude testimony from other unspecified experts who are not the subject of this motion.

The clerk is directed to forward a copy of this Order to the parties.

**ENTERED** this 21st day of April, 2023.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE