IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| YVETTE NORMAN, ) | |
| ) | |
| Plaintiff, ) | Case No. 7:22cv00096 |
| ) | |
| v. ) | **MEMORANDUM OPINION** |
| ) | |
| LEONARD'S EXPRESS, INC., ) | |
| ) | By:   Hon. Thomas T. Cullen |
| Defendant. ) | United States District Judge |

This case arises from a serious motor vehicle accident between Plaintiff Yvette Norman ("Norman") and Julian J. Kaczor, who was operating a semitruck owned by Defendant Leonard's Express, Inc. ("Leonard's Express") (Am. Compl. ¶ 2 [ECF No. 37].) Leonard's Express has disclosed two physicians it intends to offer as expert witnesses: (1) Isabelle Richmond, M.D., a neurosurgeon; and (2) Jonathan DeRight, Ph.D., a neuropsychologist. Norman seeks to limit the scope of Dr. Richmond's anticipated testimony on five grounds, and requests that Dr. Richmond produce a statement of compensation. (ECF No. 62.) Leonard's Express opposes Norman's requests. (ECF No. 80) The court has dispensed with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process. This motion is therefore ripe for decision. For the reasons below and consistent with this Memorandum Order, Norman's motion will be **GRANTED in part**, **DENIED in part**, and **TAKEN UNDER ADVISEMENT in part**.

**I.**

Along with the Supreme Court's decisions in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and *Khumo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), Federal Rule of Evidence 702 governs the admissibility of expert witnesses. Collectively, these require the trial court to ensure that proffered expert testimony is both relevant and reliable. *Daubert*, 509 U.S. at 589. Although the court must act as the gatekeeper for expert opinions, it must be mindful "that the traditional and appropriate means of challenging expert testimony are vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Kovari v. Brevard Extraditions*, LLC, 461 F. Supp. 3d 353, 369 (W.D. Va. 2020) (internal quotation marks and citations omitted). Nevertheless, reliability and relevancy are preconditions to the admissibility of expert testimony. *See Sardis v. Overhead Door Corp.*, 10 F.4th 268, 282 (4th Cir. 2021) (citing *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017)). "The proponent of expert testimony has the burden of establishing its admissibility by a preponderance of proof." *Smith v. Wyeth-Ayerst Lab'ys Co.*, 278 F. Supp. 2d 684, 691 (W.D.N.C. 2003) (citing *Daubert*, 509 U.S. at 592 n.10).

"[D]ue to the difficulty of evaluating their testimony, expert witnesses have the potential to be both powerful and quite misleading." *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) (citations omitted). "[G]iven the potential persuasiveness of expert testimony, proffered evidence that has a greater potential to mislead than to enlighten should be excluded." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). Assuming that the evidence is reliable, the court must ask whether it will "assist the trier of fact to understand or determine a fact in issue." *Md. Cas. Co.*, 137 F.3d at 783

(quoting *Daubert*, 509 U.S. at 592). "Trial judges have 'considerable leeway' in excluding evidence, and are required to ensure that 'expert testimony must be based on sufficient facts or data, and the expert must arrive at his opinions by properly applying reliable principles and methods to the facts.'" *McCulloch v. Tahsin Indus. Corp., USA*, No. 6:20-CV-00035, 2022 WL 4484214, at *12 (W.D. Va. Sept. 27, 2022) (quoting *Hickerson v. Yamaha Motor Corp.*, 882 F.3d 476, 480 (4th Cir. 2018)).

## II.

### A. "Dr. Richmond should be precluded from making inaccurate statements to the jury about discovery of pre-crash medical records in this case."[1]

As a threshold matter, the parties dispute whether all of Norman's discoverable pre-accident medical records were produced to Leonard's Express or made available to Dr. Richmond in advance of her March 3, 2023 Preliminary Report (ECF No. 63-1) or March 9, 2023 Supplemental Report (ECF No. 63-3) (referred to collectively as Dr. Richmond's "Report"). In her Report, Dr. Richmond repeatedly claims that she was unable to review these records, citing "multiple subpoenas" for them that purportedly went unanswered.[2] And the Defendant's opposition brief reads largely like a discovery motion, complaining that: (1) Norman produced 1,300 pages of medical records only two weeks before expert designation deadlines but never supplemented her written discovery responses to reflect that those records

---

[1] Each of the lettered subheadings in this Memorandum Opinion quote the various items of relief Norman seeks by her motion.

[2] Norman counters that no such subpoena was issued.

contained pre-accident medical records until after her disclosure deadline;[3] (2) that Norman never produced her "highly relevant" Atrium Health primary care records from 2009–2017 until after the expert designation deadline, and that she feigned ignorance of these records until claiming to have "discovered" them only at that late date;[4] and (3) that Norman "withheld relevant evidence to her advantage" (the "shield") but may seek to use it as a "sword" at trial by exposing Dr. Richmond's failure to review the very records Norman allegedly withheld in discovery. (*See* ECF No. 80.) Norman denies the defendant's allegations, claims that she timely produced everything she was required to, and asserts that it was *the defendant's* own failure to give the records to Dr. Richmond that left her to speculate about what they contained.

Whether or not any of these statements by Dr. Richmond or Leonard's Express are true regarding what may or may not have transpired in discovery—i.e., whether or not Norman fully and timely complied with her document-production obligations—discovery is closed. (*See* ECF No. 20.) Despite having ample time to seek leave of court to cure these perceived deficiencies prior to the discovery cut-off, or even promptly upon learning of them, Leonard's Express took no action. The court will not reopen discovery on the verge of trial for things that should have been the subject of timely motions practice.[5]

---

[3] Norman asserts that she had already timely produced these records to Leonard's Express and that this production was merely a reproduction of what she had already produced, brought on by defense counsel's confusion about what documents Norman had produced.

[4] Norman claims that there are only four Atrium Health medical records from these years, that Atrium Health was not in fact her primary care provider, and that none of these medical records are remarkable as it relates to the alleged injuries in this case.

[5] Had the defendant made a timely motion to deal with these alleged discovery violations, the court may well have agreed with the defendant that, "[i]f Plaintiff's experts are permitted to testify that to a reasonable degree of medical certainty [] Plaintiff's headaches were caused by the subject accident, Dr. Richmond should be permitted to rebut those opinions by pointing out that it is impossible to determine if the headaches (which Plaintiff reported were related to stressful situations) pre-existed the accident without review of pre-accident

The court is cognizant of the fact that "due to the difficulty of evaluating their testimony, expert witnesses have the potential to be both powerful and quite misleading." *Cooper*, 259 F.3d at 199 (citations omitted). "[G]iven the potential persuasiveness of expert testimony, proffered evidence that has a greater potential to mislead than to enlighten should be excluded." *Westberry*, 178 F.3d at 261. Dr. Richmond's testimony about whether there are relevant pre-accident medical records that she did not review, or how or why she did not have them when drafting her Report, would be outside the scope of her expertise as a neurosurgeon and therefore inherently unreliable (*see* Fed. R. Evid. 702), while also being potentially misleading to the jury.[6]

Accordingly, Dr. Richmond will be permitted to testify only about the records that she reviewed in making her report. And in response to Dr. O'Shanick's anticipated testimony that Norman's headaches were caused by the accident, she may testify—as she explains in her report—that it is impossible for her to determine the cause of those headaches. But she will not be permitted to testify or imply that there were (or are) relevant medical records, deposition transcripts, or the like that were not made available to her or the defense, that Norman withheld any such records, or that it is impossible for her to testify about the cause of Norman's headaches *because* she did not have access to all relevant records necessary to do

---

records, particularly when there is evidence of prior history of significant stress and ongoing hypertension." (Def.'s Opp. at 7 [ECF No. 80].) But no one made any such motion, and the court will not reopen discovery at this late stage.

[6] While this information is also outside of Dr. Richmond's personal knowledge, Federal Rule of Evidence 602 does not apply to expert testimony. *See* Fed. R. Evid. 602. Nevertheless, the fact that Dr. Richmond has no personal knowledge of what transpired in discovery would make any probative value from this testimony outweighed by the risk of substantial prejudice to Norman by implying that she improperly withheld relevant pre-accident medical record evidence. *See* Fed. R. Evid. 403. Whether she did or she did not, that ship has sailed.

so. The probative value of any such testimony would be substantially outweighed by the risk of undue prejudice, because it would unfairly suggest that Norman is hiding something damaging in her medical records when the defendant had procedural avenues to rectify any perceived discovery abuses, and the records at issue simply do not support such a claim. *See* Fed. R. Evid. 401–403. Dr. Richmond will therefore be excluded from testifying—whether it would be accurate or not—that "Plaintiff did not make her pre-incident records available for [her] to review."[7] (*See* Deft.'s Opp. at 5.)

For these reasons, this part of Norman's motion will be **GRANTED**, consistent with this ruling.

### B. "Dr. Richmond's non-opinion about Ms. Norman's 'significant prior medical history,' 'ongoing hypertension,' and headaches is speculative and lacks factual foundation. Therefore, it should be excluded."

In her Report, Dr. Richmond explained that "none of Ms. Norman's prior medical records have been made available" and that she did not review Norman's deposition transcript. (Preliminary Report at 1.) Indeed, she expressly prefaced these objected-to opinions by conceding that she did not review any pre-accident medical records. Despite this, she then went on to opine that Norman has "significant prior medical history" and "ongoing hypertension." (*See* Preliminary Report at 4 ("In the absence of any pre-accident medical records, despite a significant prior medical history, and ongoing hypertension, it is impossible to determine whether her relatively recent new complaint of left sided headaches is an

---

[7] If at trial Norman takes advantage of this ruling by cross-examining Dr. Richmond about her failure to review certain pre-accident medical records, the court may allow testimony about *why* Dr. Richmond did not review these records before issuing her Report.

exacerbation of a pre-existing condition.").) Indeed, every medical record that Dr. Richmond cites in her Report is from *after* the accident.

Because Dr. Richmond has not laid an adequate foundation in her report for her opinion that Norman has "significant medical history," she may not speculate about it. The court finds unpersuasive the defendant's argument that by "significant medical history" Dr. Richmond intended to refer only to the "significant stress" that allegedly resulted from Hurricane Katrina because: (1) she did not cabin her opinion to that incident; (2) she repeatedly referenced medical records that she claimed were withheld; and (3) when asked about it at deposition, Dr. Richmond testified that she was referring to things she "picked up" in Dr. O'Shanick's report—surgical treatment for a chest deformity, three childbirths, and a hysterectomy—as well as elevated blood pressure and that her mother has a history of hypertension, diabetes, and dementia. (Dr. Richmond Dep. at 90–92, Apr. 26, 2023.) Without having reviewed *any* pre-accident medical records, her broad, general assertion is not adequately grounded in facts and is therefore unreliable. *See, e.g., Thomas v. Washington Indus. Med. Ctr., Inc.*, No. 98-1652, 1999 U.S. App. LEXIS 16771, at *19 (4th Cir. July 19, 1999) (holding that the district court was within its discretion in striking an answer an expert could not rest on an adequate factual foundation). Dr. Richmond may testify about the alleged impact on her opinion of the "significant stress" she believes Norman suffered from Katrina, but not about any alleged "significant medical history" that she concedes she never considered before making her Report. The latter would strongly suggest—incorrectly, as it turns out—that there is something else—unspecified, but nefarious—contained in Norman's medical records, and that Dr. Richmond relied on it in opining that Norman "did not sustain a TBI

producing any significant long term sequella." (Supplemental Report at 2.) The risk of undue prejudice resulting from that misleading and confusing testimony substantially outweighs its probative value. *See* Fed. R. Evid. 403. Dr. Richmond's speculation about what pre-existing medical records may exist, and what they may contain, cannot provide the basis for her expert opinion under Federal Rule of Evidence 702 and *Daubert*. *See Nease*, 848 F.3d at 229 (holding that expert opinions must be based on *knowledge* and not belief or speculation).

Dr. Richmond *has* laid an adequate foundation for her opinion that Norman has "ongoing hypertension" (Preliminary Report at 4), but only *post-accident* ongoing hypertension. She indicated in her Report that Dr. Desai noted Norman's post-accident high blood pressure on June 29, 2020, and that it thereafter "remained moderately elevated." (*See* Preliminary Report at 2–3.) But since she did not opine in her Report that Norman's hypertension—and certainly not any *pre-accident* hypertension—caused her headaches, and therefore failed to draw a causal nexus between them, she will be excluded from testifying to that effect at trial. And the court's review of the available pre-accident medical records—that Dr. Richmond apparently did not review, whomever may be to blame for it—has revealed that this is a prime example of why expert opinion resting on speculation must be excluded. The records simply do not support an opinion of pre-accident "ongoing hypertension." (*See, e.g.*, Atrium Health Medical Records at 4 (Blood Pressure 104/70 on Dec. 17, 2009); 17, 30 (BP 114/79 on Oct. 16, 2021); 37 (123/88 on Oct. 31, 2013); 62 (127/81 on May 19, 2017) [ECF No. 91-1]; WMBH E.D. Medical Records at 4 (126/76 on Oct. 4, 2018) [ECF No. 91-2].)

In her Report, Dr. Richmond did not supply any alternative explanation for Norman's headaches; instead, she opined that "it is impossible to determine" their cause. In its

opposition brief, Leonard's Express claims that "pre-existing stress (related to Hurricane Katrina) and ongoing hypertension could provide an explanation for [Norman's] headaches." (Def.'s Opp. at 7.) And this may well be true. But because Dr. Richmond is the designated expert, the court's task is to evaluate her Report and what she disclosed in it; the defendant's opposition brief cannot draw causal connections between various symptoms and their potential causes that she did not make herself.

For these reasons, this part of Norman's motion will be **GRANTED**, consistent with this ruling.

C.   **"DR. RICHMOND SHOULD BE PRECLUDED FROM OFFERING ANY OPINION ABOUT MS. NORMAN'S VISION PROBLEMS, BECAUSE NO SUCH OPINION HAS BEEN DISCLOSED."**

Dr. Richmond acknowledges the right orbital area bruising and right eyelid laceration that Norman suffered. She discusses the medical records documenting their onset, progression, and, as she describes it, eventual "resol[ution] without permanent sequala." (Preliminary Report at 4.) But external and visible injuries to the eye area are different than internal and invisible sequala affecting vision, and vision problems are what is at issue, specifically the "post-traumatic vision syndrome" that each party refers to in the briefs.

Dr. Richmond acknowledges in her report that Norman reported vision problems after the accident, but she does not expressly opine as to whether her reports of vision problems are legitimate, as severe as claimed, or were caused by the accident. Nevertheless, Dr. Richmond provided enough within the four corners of her Report to justify her opinion that Norman did not suffer vision problems as a result of the accident. After marching through the relevant post-accident medical records about Norman's vision-related complaints, Dr.

Richmond opined that Dr. Beasley's finding of "severe saccadic abnormalities" and multiple diagnoses relating thereto are "incompatible with Mr. Norman's demonstrated abilities to engage in ADLs, driving and occupational activities." (Preliminary Report at 3.) Dr. Richmond then expressed her opinion that Norman "did not sustain a TBI as the direct result of the MVA." (*Id.* at 4.) And because vision problems are symptomatic of TBI,[8] Dr. Richmond's report allows the reasonable inference that her opinion is that Norman also did not suffer vision problems as a result of the MVA. Although her reasoning is thin on this point, the court believes that this part of her opinion (barely) passes muster under 702.

For this reason, this part of Norman's motion will be **DENIED**.

D. **"DR. RICHMOND SHOULD BE PRECLUDED FROM COMMENTING ON MS. NORMAN'S CREDIBILITY."**

The prime example that Norman provides of this is Dr. Richmond's statement in her report that, "Although [Norman] has altered details of the history of the MVA to subsequent providers in the setting of litigation, . . . ." (*See* Dr. Richmond Report at 4.)

Credibility determinations are "usually within the jury's exclusive purview," *United States v. Lespier*, 725 F.3d 437, 449 (4th Cir. 2013), and Dr. Richmond may not testify about Norman's credibility—an area outside her expertise—by couching it as expert medical opinion. *See, e.g., Kidd v. Wal-Mart Stores, Inc.*, No. 3:09CV264, 2009 U.S. Dist. LEXIS 105668, at *6–7 (E.D. Va. Nov. 12, 2009) (collecting cases); *Wagoner v. Lewis Gale Med. Ctr., LLC*, No. 7:15-cv-00570, 2016 U.S. Dist. LEXIS 169892, at *12–14 (W.D. Va. Dec. 8, 2016).

---

[8] www.mayoclinic.org/diseases-conditions/traumatic-brain-injury/symptoms-causes/syc-20378557, last accessed April 27, 2023.

The proposed experts in *Kidd* and *Wagoner* intended to expressly testify that the plaintiff was being untruthful: in *Kidd*, it was couched as "symptom magnification," 2009 U.S. Dist. LEXIS 105668, at *3; and in *Wagoner*, the expert had "serious doubts about [plaintiff's] credibility," 2016 U.S. Dist. LEXIS 169892, at *13. While Dr. Richmond's Report may not raise the issue of Norman's credibility as directly as in those cases, the same implication is clearly conveyed. Dr. Richmond is therefore precluded from testifying, expressly or impliedly, that Norman is lying about or exaggerating her medical condition(s)—"alter[ing] details . . . in the setting of litigation," as she describes it in her report—as is every other medical expert. No expert for either side—or any other witness—may comment on Norman's credibility.[9]

Dr. Richmond *will*, however, be permitted to testify about "the medical evidence, or lack of medical evidence, supporting [or undermining Norman's] physical complaints in this case." *Kidd* at *8. This may include testimony about why she thinks that Dr. O'Shanick's report is inconsistent with the medical records or evaluative tools he relied on in forming his opinion, including neuropsychological testing. *See, e.g., Court v. Wiggins*, No. 5:16cv0054, 2018 U.S. Dist. LEXIS 235840, at *7–9 (W.D. Va. Feb. 1, 2018).

If Norman takes issue with Dr. Richmond's interpretation of the medical records in this regard (and it appears that she does), her remedies are "the traditional and appropriate means of challenging expert testimony . . .[,] vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Kovari*, 461 F. Supp. 3d at 369 (internal quotation marks and citations omitted).

---

[9] Nothing in this decision precludes counsel from arguing the veracity of Norman's or any other witness's credibility, nor does it foreclose proper cross-examination on the issue of veracity of any non-medical-expert witnesses.

Accordingly, to the extent that Norman's motion seeks to preclude Dr. Richmond from "attacking Ms. Norman's credibility by falsely insinuating that she has changed her story for purposes of litigation[,]" it will be **GRANTED**.

### E. "DR. RICHMOND SHOULD BE PRECLUDED FROM PARROTING DR. DERIGHT'S OPINIONS."

Norman also complains that most of Dr. Richmond's Supplemental Report "just parrots" the findings and opinions expressed by Dr. DeRight, and she asks the court to preclude Dr. Richmond from repeating Dr. DeRight's findings, arguing that its probative value is substantially outweighed by the danger that it would be unduly cumulative. Fed. R. Evid. 403.

It will not be unduly cumulative for Dr. Richmond to discuss Dr. DeRight's report to explain how and why she relied, in part, on the results of his examination and attendant report in rendering her own opinion because each expert witness will be offering "a distinct insight into the question." *See, e.g., United States v. Peterson*, No. 1:19CR00054, 2020 U.S. Dist. LEXIS 154490, at *10 (W.D. Va. Aug. 26, 2020) (quoting *Stone ex rel. Stone v. Stoker*, No. 91-2126, 1992 U.S. App. LEXIS 10417, 1992 WL 98356, at *2 (4th Cir. May 13, 1992) (per curium) (unpublished)). Because Dr. Richmond is a neurosurgeon and Dr. DeRight is a neuropsychologist, these experts have distinct but complementary specialties. For example, Dr. DeRight performed a neuropsychological assessment of Norman on May 5, 2023, and Dr. Richmond, in her March 9, 2023 Supplemental Report, explained that she reviewed Dr. DeRight's testing and why it "support[s her] opinion that Ms. Norman did not sustain a TBI producing any significant long term sequella as the direct result of the MVA of 12/28/2019" and that Norman "does not demonstrate significant PTSD, nor does her documented clinical

course suggest that this has been a major problem." (Supplemental Report at 2.) To the extent that Dr. DeRight's opinions comprise part of the foundation for Dr. Richmond's opinions or provide context for them, she will be permitted to testify about them.

And to the extent that Dr. Richmond relies on Dr. DeRight's anticipated trial testimony that Norman told him that she was told that she had PTSD from Hurricane Katrina—as opposed to the motor vehicle accident—that is a credibility issue going to the weight of the evidence rather than its admissibility. If the jury does not believe Dr. DeRight on that point, Dr. Richmond's reliance on Norman's purported statement will be of little to no useful import to the defense.

But Dr. Richmond will not be able to regurgitate Dr. DeRight's opinions in their entirety or beyond the bounds set by Rule 403 prohibiting unduly cumulative testimony. Only Dr. DeRight will be permitted to explain those opinions in detail. Beyond setting out these guideposts, the court will not rule on this issue more precisely before the testimony is adduced at trial and will therefore take this part of Norman's motion under advisement.

For these reasons, this part of Norman's motion will be **GRANTED in part** and **TAKEN UNDER ADVISEMENT in part**, consistent with this ruling.

F. **"THE COURT SHOULD COMPEL DEFENDANT[] TO PRODUCE DR. RICHMOND'S STATEMENT OF COMPENSATION, AS REQUIRED BY RULE 26(A)(2)(B)(VI)."**

An expert witness's report "must contain a statement of the compensation to be paid for the study and testimony in the case." Fed. R. Civ. P. 26(a)(2)(B)(vi). Norman explains that Leonard's Express has provided Dr. Richmond's fee schedule but that it only discloses the rates that she charges, without disclosing the total compensation Dr. Richmond has actually

been paid for her work in this case. With its opposition, Leonard's Express produced Dr. Richmond's fee schedule. (*See* ECF No. 80-1.) Dispositively, it lists the hourly rates for Dr. Richmond's services. (*See id.*) Because Rule 26 requires a statement of the compensation "to be paid" to an expert—as opposed to the amount "paid to date"—and the compensation disclosure is necessarily to be made at the time the expert's report is disclosed—as opposed to at the time of trial—the defendants have satisfied Rule 26 by producing to Norman the fee schedule.[10]

For these reasons, this portion of Norman's motion will be **DENIED**.

### III.

For these reasons and as heretofore described, Norman's motion will be **GRANTED in part**, **DENIED in part**, and **TAKEN UNDER ADVISEMENT in part**.

The clerk is directed to forward a copy of this Order to the parties.

**ENTERED** this 4th day of May, 2023.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE

---

[10] Norman's reply brief indicates that she already knows it is somewhere north of $13,000. And she may of course ask Dr. Richmond at trial, as she did at deposition, how much she has been paid to date.