IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| YVETTE NORMAN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 7:22cv00096 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| LEONARD'S EXPRESS, INC., | ) | |
| | ) | By:  Hon. Thomas T. Cullen |
| Defendant. | ) | United States District Judge |

    This case arises from a serious motor vehicle accident involving Plaintiff Yvette Norman ("Norman") and Julian J. Kaczor, who was operating a semitruck owned by Defendant Leonard's Express, Inc. ("Leonard's Express") (Am. Compl. ¶ 2 [ECF No. 37].) The parties have filed several motions *in limine* that the court will address in turn.

**I.   LEONARD'S EXPRESS'S MOTION TO EXCLUDE THE CRASH VIDEO AND 911 CALL AUDIO (ECF NO. 51)**

  **A.  The Crash Video**

    Leonard's Express moves to exclude a 12-second-long video clip,[1] apparently recorded from inside the semitruck's cabin, that shows the vehicles colliding. Specifically, it depicts the semitruck changing lanes from left to right before colliding with the car in the right lane (in which Norman was a passenger) and causing it to run off the road.

    Leonard's Express argues that the video footage is not relevant since it has conceded liability for the accident. As Defendant's argument goes, because the video has no bearing on

---

[1] The crash video and 911 audio are not on the docket, but the court instructed the parties to submit them to the court and it has carefully reviewed each.

the issue of damages, it is not relevant to any fact at issue. *See* Fed. R. Evid. 401. In the alternative, Leonard's Express argues that the video's probative value is substantially outweighed by the risk of undue prejudice by appealing to the jury's emotion and confusing the now-limited issues before the court. Lastly, it argues that the video would be cumulative of other evidence because Norman has designated multiple experts and medical providers to testify about the nature and extent of her injuries.

In support of its position that the video is irrelevant, Leonard's Express cites *Bolden v. Amtrak*, No. 04-1125, 2005 U.S. Dist. LEXIS 11987 (E.D. La. June 14, 2005), but that case is decidedly an outlier. The court finds more persuasive the majority view that evidence of the details of a motor vehicle accident are relevant to the issue of resulting injuries, and that this type of evidence is more probative than prejudicial. *See, e.g., Boykin v. W. Express, Inc.*, No. 12-cv-7428, 2016 U.S. Dist. LEXIS 14771, at *5 (S.D.N.Y. Feb. 5, 2016) ("[T]he Court agrees that evidence of the details of a collision can be relevant to the issue of damages and more probative than prejudicial."); *Gioioso v. Thoroughgood's Trans., LLC*, No. ADC-16-3841, 2018 U.S. Dist. LEXIS 182838, at *7–8 (D. Md. Oct. 24, 2018) (holding that photographs of the plaintiff's vehicle taken after the motor vehicle accident were admissible as relevant to the injuries she allegedly suffered in the accident). This evidence is especially relevant to damages in this case because it reveals what happened *in real time*. Specifically, the video is relevant to the nature and extent of Norman's injuries because the crash's severity has the tendency to make it more probable that Norman sustained the injuries that she alleges. *See* Fed. R. Evid. 401.

The court also finds that the video's probative value is not substantially outweighed by the risk of undue prejudice or confusion. Where a party seeks to introduce evidence that is probative, "the balance under [Federal] Rule [of Evidence] 403 should be struck in favor of admissibility, and evidence should be excluded only sparingly." *United States v. Aramony*, 88 F.3d 1369, 1378 (4th Cir. 1996). The video provides critical context for testimony about Norman's injuries. It could also aid the jury in determining whose testimony it will credit regarding those alleged injuries, including that of the medical experts who are at odds as to whether Norman sustained a traumatic brain injury ("TBI"). Finally, insofar as this video is the only non-testimonial evidence depicting, in real time, the accident at issue, it is not needlessly cumulative of eyewitness testimony describing the same.

But the *audio* heard in the video is inadmissible. When the accident occurs, Kaczor curses audibly. Even if that profane utterance provided some limited probative value on the issue of liability, it has no bearing on causation and damages. Any marginal probative value that an expletive may have is substantially outweighed by the risk of undue prejudice to Leonard's Express.

For these reasons, this part of Leonard's Express's motion will be denied but the video may only be played with its audio muted.

### B. The 911 Call Audio

Leonard's Express moves to exclude a one-minute-long 911 telephone call made by Meghan Crjnak ("Crjnak"), an eyewitness to the crash. In the 911 call, Crjnak reports that a car "just got hit really bad on Interstate 81 . . . it flipped over, it's really, really bad," that she is "sure" there are injuries and fluids leaking, and that "a tractor-trailer just hit this car . . . and

the car flipped over a lot of times." Crjnak sounds excited throughout the call and, towards the end, she breaks down crying.

Leonard's Express argues that the 911 call is not relevant since liability is conceded and the caller does not relay any observations about Norman or her condition. *See* Fed. R. Evid. 401. In the alternative, Leonard's Express argues that the call's probative value is substantially outweighed by the risk of unfair prejudice and confusion. It argues that Crjnak's describing the truck as a "tractor trailer" is inaccurate and therefore misleading since Kaczor was operating a truck cab without a trailer, and that "the inflammatory and upsetting nature of the call" would shock the jury and could lead them to assess damages based solely on emotion. Fed. R. Evid. 403.

The 911 call is relevant because the severity of the crash—for example, it appearing to this witness that it was "really, really bad" and that the car had flipped over "a lot of times"—has the tendency to make it more probable that Norman sustained the injuries she now claims and to the degree that she alleges. *See* Fed. R. Evid. 401. But the court finds that any probative value of the 911 call audio is substantially outweighed by its risk of undue prejudice to Leonard's Express. *See* Fed. R. Evid. 403.

Although Crjnak's 911 call describes what she saw, its probative value is overshadowed by her emotion and excitement. These emotional aspects would tend to inflame the jury without adding any relevant information. Moreover, Crjnak has been deposed in this matter and Plaintiff intends to present her testimony to the jury. Thus, the jury will hear Crjnak's testimony about the accident at issue *without* the overwrought commentary.

For these reasons, this part of Leonard's Express's motion will be granted.

## II. NORMAN'S MOTION REGARDING PTSD FROM HURRICANE KATRINA (ECF NO. 60)

Norman asks the court to exclude evidence, suggestion, or speculation that she has post-traumatic stress disorder ("PTSD") from experiencing Hurricane Katrina prior to the crash at issue in this case. (Pl.'s Mot. ¶ 1 [ECF No. 60].) Specifically, Norman argues that Dr. DeRight's suggestion in his expert report that she has PTSD because of her experience in Hurricane Katrina is "not based on any factual foundation" and should be excluded. (*Id.* ¶ 5.)

While expert opinions must be based in fact and may not be subjective belief or unsupported speculation, experts are only required to state their opinions to "a reasonable degree of certainty." *See Riggins v. SSC Yanceyville Operating Company, LLC*, 800 F. App'x 151, 155–57 (4th Cir. 2020) (collecting cases); *see also* Fed. R. Evid. 702(b), 703. "Alleged gaps in reason or a disagreement on causation are not a basis for exclusion of an expert. Instead, such arguments go to the weight of the evidence, not its admissibility." *Lone Mountain Processing, Inc. v. Bowser-Morner, Inc.*, No. CIV.A. 2:00CV00093, 2005 WL 1894957, at *51 (W.D. Va. Aug. 10, 2005) (citing *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1078 (5th Cir. 1996)). "[R]ejection of expert testimony continues to be the exception rather than the rule." *Id.* at *50–51.

Contrary to Norman's argument, Dr. DeRight did not base his PTSD opinion on "rank speculation." Instead, he opines that Dr. O'Shanick's diagnosis of PTSD is "problematic," in part because his report does not discuss "alternative sources of trauma that predated the accident, such as close involvement with a natural disaster such as Hurricane Katrina." (*Independent Neuropsychological Evaluation of Yvette Norman*, Mar. 5, 2023, p. 14 [ECF No. 81-1].)

Dr. DeRight's opinion was allegedly based on Norman's statements *to him*, as reflected in his notes:

> I was in Louisiana during Katrina. Was depressed after that. I ended up in Charlotte from Katrina. When the storm occurred, I was there—me, my mom, and kids. I was going through a separation. I worked as a nurse. I worked in a medical center. I worked on a skeleton crew. One nurse at a time. I didn't imagine [the storm] was going to be that bad. Nobody did. The storm hit that night. It was so wicked. I was on the third floor. Water was coming through that. We were putting pillow and blankets against the wall.

(*Id.* at 3; *see also* Dep. of Jonathan DeRight, Ph.D., 26:22–27:11, Apr. 14, 2023 [ECF No. 81-2].) Furthermore, Dr. DeRight testified that, after Norman made this statement, he asked her if she had "ever been diagnosed with anything," to which she responded, "They saying now it was PTSD." (Dr. DeRight Dep. 31:1–5.)

Importantly, Dr. DeRight does not need to expressly opine that Norman has or does not have PTSD from Katrina because the purpose of his testimony is to call into doubt Dr. O'Shanick's methodology related to the PTSD diagnosis and thereby discredit the validity of Dr. O'Shanick's PTSD opinion.[2] As such, his opinion that Dr. O'Shanick failed to adequately consider the possibility that Norman may have PTSD as the result of Katrina, is based on Norman's own comments allegedly made to Dr. DeRight, not his subjective belief or speculation. Dr. DeRight will therefore be permitted to criticize Dr. O'Shanick's PTSD diagnosis based, in part, on his interview of Norman.

---

[2] Because Dr. DeRight did not opine in his report that Norman, in fact, suffered PTSD as a result of Hurricane Katrina, he is precluded from offering that opinion at trial.

Insofar as Norman contends that she never told Dr. DeRight that she had PTSD because of Hurricane Katrina—or that Dr. DeRight misinterpreted what she had said—that is not sufficient grounds to prevent Dr. DeRight from testifying on this issue. Rather, Norman is permitted to testify as to what she did (or did not) say to Dr. DeRight and to cross-examine him on this issue. The jury will decide which witnesses to believe and how much weight to assign to their respective testimony. *Lone Mountain Processing, Inc.*, 2005 WL 1894957, at *17 (noting that any "disagreement" a party has with an expert's opinion "goes to the weight of his opinion. Such concerns may be properly addressed on cross-examination and left to the jury's determination."). At bottom, this is a question of the weight to be assigned to Dr. DeRight's testimony on this issue, not its admissibility. Norman's motion will be denied.

### III. NORMAN'S MOTION REGARDING PRIOR INCIDENTS (ECF NO. 61)

Norman asks the court to exclude evidence relating to car accidents she was previously involved in, arguing that they are irrelevant and prejudicial to her case. (Pl.'s Mot. ¶¶ 1, 2 [ECF No. 61].)

Prior to the accident at issue, Norman was involved in three car accidents. First, on October 4, 2018, she was rear-ended at low speed by another car in heavy traffic. Afterward, Norman complained to hospital staff of a headache and some ringing in her left ear. (*Id.* ¶ 6.) Second, in November 2018, Norman was driving a car that struck a deer. Her car sustained damage, but she did not suffer any injuries or seek any medical attention. (*Id.* ¶ 9.) Third, in May 2019, Norman was struck from behind while she was stopped at a stop sign. Norman did not seek medical attention and claims that she did not suffer any injuries. (*Id.* ¶ 10.)

Norman argues that evidence of or references to these prior accidents should be excluded because their admission would "invite the jury to speculate that [Norman] is 'accident prone,'" or that she must have had a medical condition that predated the accident at issue in this case. (Pl.'s Mot. ¶ 4.) Leonard's Express counters that the prior accidents are relevant to Norman's pre-accident "baseline." (Def.'s Opp. Br. p. 3 [ECF No. 82].) In other words, Leonard's Express contends that the prior accidents undermine Norman's contention that her injuries and attendant symptoms (most prominently, chronic headaches) stem exclusively from the accident at issue in this case.

Because Leonard's Express has admitted liability, to be admissible, Norman's prior accidents must bear on the issues of causation or damages. *See* Fed. R. Evid. 401; *Jones v. Ford Motor Co.*, 204 F. App'x 280, 283 (4th Cir. 2006). The court finds that the November 2018 and May 2019 accidents are irrelevant, but the October 2018 car crash is *potentially* relevant.

The November 2018 and May 2019 accidents are irrelevant because Norman did not suffer any injuries or seek any medical attention. The court is not persuaded by Leonard's Express's argument that these accidents are relevant to Norman's "baseline." Even if they had some limited probative value, it would be substantially outweighed by the risk of undue prejudice and issue confusion by suggesting that Norman is responsible for the accident because she is accident prone, even though Leonard's Express has conceded liability. *See* Fed. R. Evid. 403. Accordingly, Norman's motion at ECF No. 61 will be granted with respect to the November 2018 and May 2019 accidents.

As for the October 2018 accident, *if appropriately introduced*, evidence or testimony relating to it could tend to show that Norman may have had preexisting injuries or symptoms.

Following the October 2018 accident, Norman allegedly complained to hospital staff of a headache and some ringing in her left ear. (Pl.'s Mot. ¶ 6.) These symptoms are similar to her reported symptoms stemming from the accident at issue in this case. Indeed, as a result of the December 2019 accident, Norman allegedly lost consciousness, was diagnosed with a concussion, and later complained of headaches. (Dr. O'Shanick Report at 3 [ECF No. 82-1].) *Appropriate* testimony about it would therefore be probative of Norman's claims by tending to make the existence of a preexisting injury more likely than without its admission. If the jury believed that the October 2018 accident caused some type of head injury or related symptoms, it could also believe that Leonard's Express is not responsible for the totality of Norman's alleged damages, because an injury—or some of her reported symptoms—predate the accident in question. But despite its potential admissibility, Leonard's Express has failed to provide medical expert testimony causally linking the October 2018 accident to Norman's current medical condition.

Courts have consistently held that "[n]o expert testimony is required to assist jurors in determining the cause of injuries that are within their common experiences or observations." *Hendrickson v. Cooper*, 589 F.3d 887, 892 (7th Cir. 2009). For instance, an expert need not present evidence of a causal connection where "the connection is a kind that would be obvious to laymen, such as a broken leg from being struck by an automobile." *Moody v. Maine Cent. R. Co.*, 823 F.2d 693, 695 (1st Cir. 1987) (quoting 4 F. Harper, F. James, O. Gray, The Law of Torts § 20.2 (2d ed. 1986) (footnote omitted); *Robinson v. Hager*, 292 F.3d 560, 564 (8th Cir. 200); *see also Zartner v. Miller*, 760 F. App'x 558, 563 (10th Cir. 2019) (noting that "expert testimony might be unnecessary to find causation when a brawl leads to a broken nose or

black eye"). On the other hand, proof of causation generally must be established by expert testimony when an injury is sophisticated or complex. *Zeismer v. Hagen*, 785 F.3d 1233, 1239 (8th Cir. 2015).

Injuries like TBI and PTSD are complex and require "expert medical testimony to establish causation." *Smith v. GMC*, 376 F. Supp. 2d 664, 667 (W.D. Va. 2005) (applying Tennessee law); *see also Roop v. DeSousa*, Civil No. 3:21cv657, 2023 U.S. Dist. LEXIS 40247, at *49–61 (E.D. Va. Mar. 9, 2023) (surveying Virginia law and explaining that expert testimony is not required to establish causation in cases where the injury is simple and a lay jury would therefore comprehend it without expert testimony, but cautioning that expert testimony is required where the injury is complex and beyond the common knowledge and experience of a lay jury). Norman's alleged injuries are not the obvious and superficial kind that fall into the "simple injury" category not requiring expert testimony. *See Taylor v. Shreeji Swami, Inc.*, 820 Fed. Appx. 174, 176 (4th Cir. 2020) (applying North Carolina Law and holding that lay testimony was insufficient to establish causation with respect to allegations of exacerbation of claustrophobia, PTSD, depression, anxiety, and GERD stemming from the plaintiff having been trapped in an elevator).

Ultimately, the court agrees with Norman that expert testimony is necessary to establish some causal link between the October 2018 car accident and Norman's current symptoms, if Leonard's Express wants to take this approach. But despite the existence of records pertaining to the October 2018 accident, neither Dr. Richmond nor Dr. DeRight discussed those records in their respective reports, and neither rendered an opinion causally linking the October 2018 accident to Norman's current medical condition. Moreover, neither opined that Norman's

current headaches, TBI, or PTSD were caused by *that prior accident*, or that her pre-existing headaches were exacerbated by the accident at issue.

Even if the court was persuaded by Leonard's Express's argument that headaches are within the knowledge and competence of a lay juror—i.e., that headaches are a simple injury not requiring medical expert causation testimony—that is still insufficient as a matter of law. Record evidence that Norman suffered headaches and ringing in her ears from the October 2018 accident, coupled with Dr. Richmond's testimony that Norman did not suffer a TBI as a result of the accident at issue, does not give license to defense counsel to argue or imply that her current symptoms were caused by the October 2018 accident. There is no expert opinion to that effect, so Leonard's Express cannot ask the jury to draw that unsupported inference. Simply put, to tie the October 2018 accident to this case, Leonard's Express needed one of its medical experts to make that connection. Neither did, so Defendant will not be permitted to suggest as much at trial.

Because it involves complex injuries requiring expert medical causation testimony, Norman's motion will be granted with respect to the October 2018 accident as well.

### IV. NORMAN'S OMNIBUS MOTION *IN LIMINE* (ECF NO. 75)

Norman also moves to exclude five items or categories of evidence. The court addressed the first by separate written order along with Norman's intertwined motion at ECF No. 95. (*See* ECF No. 112.) The other four are addressed below.

#### A. "References to pre-existing records being absent or missing."

Leonard's Express complains that Norman did not disclose relevant pre-accident medical records—specifically (1) 2018 records from Dr. Jamie Kuo indicating that Norman

sought treatment for headaches after a 2018 motor vehicle accident or (2) records from Atrium Health—until after the expert disclosure deadline. (*See* ECF No. 90 at 5–6.) At oral argument, Leonard's Express's counsel, for the first time, proffered additional information supporting its position that additional medical records do, in fact, exist, and that Norman (or her counsel) purposefully withheld them. Specifically, counsel explained that its "medical-canvass investigation"[3] revealed several additional providers that Norman may have received treatment from, but never produced records for, including Novant Presbyterian, CaroMont Regional Medical Center, and Lake Regional Medical Center. Leonard's Express argues that, because Dr. O'Shanick failed to review all of Norman's pre-existing medical records, including these non-disclosed records, he should be precluded from testifying that Norman did not have any relevant pre-existing conditions or symptoms.

Norman counters that she fully complied with her discovery disclosure obligations except with respect to the Atrium Health records, which she admittedly produced late, but she argues that the Atrium Health records are irrelevant. As to the allegedly undisclosed Novant, CaroMont, and Lake Regional records, Norman's counsel responded at oral argument by asserting that he was unaware of any additional records and that, if they existed, he would have liked to have had them as well. In support, Norman's counsel pointed to an email that he sent after Dr. O'Shanick's and Dr. Richmond's depositions had taken place—during which Leonard's Express's counsel mentioned the existence of records from these other entities— asking Leonard's Express's counsel to provide whatever information they had about these

---

[3] As counsel explained, a medical canvass is essentially an insurance database search that generates a list of medical providers, hospitals, or other entities who may have submitted insurance claims on behalf of a patient. So far as the court is aware, the results generated do not include any specifics regarding the nature and extent of treatment provided.

"missing" records. (*See* E-Mail, Apr. 14, 2023 [ECF No. 63-4].) Norman's counsel further represented that counsel for Leonard's Express never responded to his email, an assertion that defense counsel did not dispute.

Maybe additional relevant pre-accident medical records exist, maybe they do not. But discovery is closed and there are no outstanding motions to compel or extend Leonard's Express's expert disclosure deadlines. For the reasons described more fully in the court's Memorandum Opinion explaining why Dr. Richmond would be precluded from speculating about missing records or why she did not have them (*see* ECF No. 103 at II(A)), Leonard's Express will be prohibited from arguing or eliciting testimony suggesting that Norman withheld relevant pre-accident medical records in discovery, unless, as explained below, Norman admits to doing so. Because neither party discovered these alleged records, the court simply cannot weigh their potential probative value, if any.[4] And because their probative value

---

[4] Just as Dr. Richmond may not testify about what transpired in discovery or otherwise speculate about what other records may, or may not, exist, neither may anyone else, unless Norman admits to having withheld relevant medical records on the witness stand. (*See* ECF No. 103 at 5–6.) For example, if there is no basis *in the record* for it, Leonard's Express may not ask Dr. O'Shanick whether he reviewed records from these medical-canvass providers (knowing that the answer will be "no") and thereafter argue that the jury should infer that those records contained something damaging to Norman's case. This type of prejudicial speculation-inviting questioning in the jury's presence is mainly what Norman's motion seeks to avoid, and for good reason. And the court would be remiss if it failed to note its frustration with defense counsel's tardiness in raising this issue and providing factual support. At bottom, if Defendant genuinely believed that additional medical records existed that would potentially undermine Norman's claims regarding the extent of her alleged injuries, it had ample opportunity *during discovery* to request these records from Plaintiff's counsel, to obtain them through subpoenas, to seek the court's assistance to remedy Plaintiff's alleged failure to comply with her discovery obligations, including truthfully answering interrogatories and providing all relevant documents in her possession, or to move for sanctions, including for spoliation of evidence. But Defendant didn't take any of these steps to correct this perceived deficiency. Despite suspecting that additional medical information was available, it apparently made the tactical decision not to run this suspicion to ground during discovery so that it could attempt to impugn, without concrete evidence, Norman's credibility at trial. Defendant justifies this strategy by arguing that it has no burden of proof at trial. While this is indeed correct, it misses the mark. To argue or imply that Plaintiff is not credible because she *might* have withheld relevant medical evidence, Defendant is obligated to back up that damning claim.

is a mystery to everyone involved and could only be speculated about by the jury, the risk of resulting prejudice to Norman would be immense. *See* Fed. R. Evid. 403.

But whether a medical expert reviewed all medical records prior to giving his or her expert opinion *is* relevant to challenging that expert's methodology. Here, the court believes counsel may have a good-faith basis to question whether Dr. O'Shanick (or any other expert) reviewed Norman's entire medical history before offering his opinion. If Dr. O'Shanick has personal knowledge that there are records he did not review—either from his own study of Norman's case or, for example, Norman's trial testimony about her previous medical history and records—and he nevertheless rendered an opinion without reviewing them, defense counsel may probe Dr. O'Shanick's personal knowledge (or lack thereof) about that history and whether it was adequately considered. What counsel may not do *on this record*, though, is speculate—or ask anyone else to speculate—about what *potentially* unavailable medical records might have said. In other words, while it is appropriate to question whether all available medical records were reviewed, it would be improper to inquire about additional records that might exist, but were never obtained (by anyone), unless these witnesses have personal knowledge of them.

Given the importance of this issue, the court will take limited evidence outside the presence of the jury to get to the bottom of it.[5] During this proceeding, counsel for Leonard's Express may ask Norman whether she has been treated at one or more of these medical-canvass-identified facilities. If Norman testifies that, "no," she has not, then Leonard's Express's inquiry will come to an end, and this issue will not be mentioned at trial—either

---

[5] The court will conduct this short, limited evidentiary hearing prior to jury selection on Monday morning.

during the examination of witnesses, including Norman and Dr. O'Shanick, or in argument by counsel. Leonard's Express has not run to ground this issue in discovery and further questioning along this line could at that point only lead the jury to speculate about whether these records exist and what may be in them—and Leonard's Express would in that case be misleading the jury by implying that the records exist and contain something harmful to Norman's case, when Leonard's never proved this up in discovery. If, however, Norman admits to having been treated by one or more of these other providers, the court may conduct further inquiry outside of the jury's presence to determine the appropriate course of action.

Ultimately, if Leonard's Express lays an adequate foundation that Norman was in fact treated at Novant, CaroMont, or Lake Regional—or by any other medical providers identified in its "medical-canvass investigation,"[6]— it may ask Dr. O'Shanick whether he reviewed those records in forming his opinion. Without that foundation, it may not pose these questions or otherwise imply that Norman was treated by other medical providers but failed to produce relevant medical records.

This part of Norman's motion will therefore be granted in part, denied in part, and taken under advisement.

### B. "To exclude any evidence, argument, or suggestion concerning whether other occupants of the car in which [Norman] was a passenger were injured, the relative degree to which they were injured compared to her, and the settlement of any personal injury claims asserted by them."

---

[6] Leonard's Express is simultaneously being ordered to file with the court, under seal, and provide to opposing counsel the results of its "medical-canvass investigation" and any other evidence supporting its claim that Norman withheld relevant medical records.

Norman represents that the vehicle's other two occupants—her son and her granddaughter—suffered only "bumps and bruises" in the accident. Norman is claiming more severe injuries including TBI and PTSD from the accident.

Because the other occupants were positioned differently in the vehicle in which Norman was a passenger, the extent of *their* injuries is irrelevant to determining the existence and extent of *Norman's* injuries and will be excluded. *See* Fed. R. Evid. 401; *see also Switzer v. Beach*, Civil Action No. 1:18-cv-066, 2019 U.S. Dist. LEXIS 125602, at *5 (E.D. Tx. July 26, 2019). Even if there is some relevance to the extent of injuries suffered by other passengers, its probative value is substantially outweighed by the risk of prejudice or confusing the jury, because, invariably, one passenger in a motor vehicle accident may suffer catastrophic injury while another in the same vehicle in the same accident may suffer only scratches. The issue in this case is the extent of *Norman*'s injuries caused by the accident, not the extent of injuries suffered by other vehicle occupants, and testimony about other vehicle occupants would "tend[] to distract the jury from the central issue in this case—the extent of [Norman]'s injury." *Hocevar v. Rao*, No. 72671, 1998 Ohio App. LEXIS 5773, at *7 (Ct. App. Dec. 3, 1998).

The case cited by Leonard's Express—*Long v. TRW Vehicle Safety Sys.*, No. CV09-2209, 2011 U.S. Dist. LEXIS 119111, at *6 (D. Ariz. Oct. 14, 2011)—is distinguishable because it was a products liability action against a seatbelt manufacturer for defective restraints. The court in that case only denied the defendant's motion to exclude evidence of injuries to occupants other than the plaintiffs (1) because it tended to "make more likely Plaintiffs' allegation that their severe injuries were caused by the alleged failure of the seatbelts and their resulting ejection from the vehicle"; and (2) on the condition that it would "consider a limiting

instruction which makes clear that evidence of the other occupants' injuries is relevant only in evaluating Plaintiffs' claims as to the cause of their injuries." *Id.* at 5–6.

For these reasons, this part of Norman's motion will be granted.

### C. "From eliciting any testimony regarding, or otherwise mentioning, th[e] purported altercation [between Plaintiff's son and Kaczor]."

Any post-accident altercation that may have taken place between Norman's son and Kaczor is irrelevant to the issues of causation and damages and may not be mentioned at trial. *See* Fed. R. Evid. 401, 402. Even if it had some limited probative value—which the court cannot fathom—it would be substantially outweighed by the risk of confusing the issues and prejudicing Norman. This part of Norman's motion will therefore be granted.

### D. "From eliciting any testimony regarding, or otherwise mentioning, Plaintiff's religion at trial."

Norman's religious affiliation is irrelevant to the issues of causation and damages and so it may not be mentioned at trial. *See* Fed. R. Evid. 401, 402; *cf.* Fed. R. Evid. 610 ("Evidence of a witness's religious beliefs or opinions is not admissible to attack or support the witness's credibility."). In its brief, Leonard's Express concedes that Norman's religious affiliation is irrelevant and that it does not intend to introduce evidence about it. This part of Norman's motion will therefore be granted to the extent that her religious affiliation may not be mentioned at trial—including the words "Mormon," "Latter Day Saints," or any other terms that would convey or suggest her religious affiliation.

But to the extent that Norman's level of participation in various life activities—including religious ones—may have been affected by the accident, that participation, and

whether her activity level has been affected, is relevant to the issue of the existence and extent of her injuries. This type of evidence will be permissible in modified form.

### V. NORMAN'S MOTION TO EXCLUDE DEPOSITION TESTIMONY OF STEPHANIE MELANCON (ECF NO. 76)

The court will not exclude Stephanie Melancon's deposition testimony based on genuine and justifiable confusion about her employer's correct corporate name. This is especially true because the parties themselves were, until very recently, uncertain about the entity's correct legal name.

Leonard's Express described the Rule 30(b)(6) depositions it sought to take as being for "Bayada Home Health and Egan Ochsner Pediatric Clinic." (Def's. Opp. Pl.'s Mot. for Protective Order at 5 [ECF No. 58].) At the April 19, 2023 hearing on Norman's motion for a protective order and to quash (ECF No. 53), the court recalls the parties referring to this entity as *Ochsner*. Based on Leonard's Express's pretrial disclosures (ECF No. 56 at 3), the court described the Ochsner entity as "Ochsner Pulmonary Clinic" in its Order on this issue. (*See* Order, Apr. 20, 2023 [ECF No. 68].) Leonard's Express's pretrial disclosures elsewhere refer to "Egan Ochsner Pediatric Clinic." (*See* ECF No. 55.) Its first amended Rule 30(b)(6) deposition notice referred to "Egan Ochsner Pediatric Home Care" (ECF No. 76-2) and its second amended Rule 30(b)(6) deposition notice referred to "Stephanie Melancon, Executive Director of Egan Healthcare of Plaquemines, Inc." (ECF No. 76-3). E-mails between defense counsel and nonparty counsel reveal that LHC Group, Inc. operates healthcare agencies across the country, one of which is "Egan Healthcare of Plaquemines, Inc. *d/b/a Egan-Ochsner* Home Health of New Orleans," and that "*Egan* is a joint venture between LHC Group and *Ochsner*." (Counsel E-Mails, Apr. 20, 2023 [ECF No. 87-4].) And the *doing business as* name of the entity

is "Egan-Ochsner" Home Health. It is still not clear to the court if Norman had another employer named "Ochsner," aside from this "Egan" entity.

But what Norman does *not* dispute is that this entity—whether under some version of the name "Egan" or "Ochsner"—was Norman's employer. (*See* Pl.'s Mot. at 2 n.2 ("Plaintiff picked up some part time work from Egan from time to time. Egan's records show that she earned a total of $4,095 in 2022 for such part time work.") [ECF No. 76].) And the intent of the court's Order at ECF No. 68 was to effectuate the parties' stipulation, expressed to the court at the April 19 hearing, that the Bayada deposition and this other employer entity deposition would proceed. Norman never filed a motion to quash before the deposition took place despite knowing of this Egan-Ochsner discrepancy beforehand. At bottom, the deposition to be taken was of Norman's employer, and it was. The court is not persuaded that Norman was blindsided or prejudiced as a result.

Although the court agrees with Norman that the Melancon deposition was not technically a Rule 30(b)(6) deposition of a corporate designee, the testimony taken was within the scope contemplated by the parties. Corporate-designee depositions are for an entity to "designate one or more . . . persons who consent to testify *on its behalf* . . . . The persons designated must testify about information known or reasonably available *to the organization*." Fed. R. Civ. P. 30(b)(6)(emphasis added). Melancon is the Executive Director of Egan Healthcare of Plaquemines, Inc. (Melancon Dep., Apr. 23, 2023 at 9:7–8.)[7] Even though Melancon did not appear as a corporate representative and appeared only in her personal

---

[7] Although the Melancon deposition is not on the docket, the court has instructed the parties to produce it to chambers and accordingly has reviewed it in its entirety.

capacity (*see id.* at 7:16–8:8), she was familiar with Norman's employment history (*id.* at 8:9–22) and the testimony taken was relevant to and largely satisfied the stated objectives of this deposition. For example, Melancon testified about Norman's work history for Egan, including her attendance, rates of pay, and lack of disciplinary actions. Any resulting prejudice to Norman based on Melancon's testifying based on her personal knowledge, rather than as a corporate representative, is limited and not significantly outweighed by the testimony's probative value. *See* Fed. R. Evid. 403. The only questions that corporate counsel objected to and that Melancon did not answer related to the entity's corporate structure (*see, e.g.*, Melancon Dep. at 14:12–18; 14:22–15:7; 22:17–23:8), and that information is irrelevant to the issues of causation and damages.

For these reasons, Norman's motion to exclude Stephanie Melancon's deposition testimony (ECF No. 76) will be denied.

The clerk is directed to forward a copy of this Order to all counsel of record.

**ENTERED** this 18th day of May, 2023.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE